Thank you. May it please the court, Your Honor, Michael Park, representing petitioner Jose Prieto. Your Honor, in this case, we have a situation involving an administrative search. We believe Davis does apply. We also believe that the facts would indicate that the search of Mr. Prieto was more extensive and intensive than necessary under the Fourth Amendment. As the court knows, the facts would show that Mr. Prieto went to appear before a family court hearing on a divorce proceeding and that he had gone through a security checkpoint. He was screened and it beat. Well, there's a standing issue to the extent that he said he just found this pouch. Therefore, he couldn't have had much of an interest in the innit, right? Your Honor, on that note, we would just say that the facts would show that Prieto found property just before he had entered the courtroom. He did exercise dominion and control over that property. Thus, he had adopted it and would. Okay. So he kept it. He didn't abandon it. Then the question is whether or not he consented. And, of course, he consented. Did he not? Because he kept on going through the process and went into the court. He consented. However, this consent was ineffective because the security officers said that he was going to search it anyway. The officer ---- But he had the right to just turn around and say, you know, I don't think I want to go to court today. That would have been perfectly fine. Under the facts and circumstances, Mr. Prieto did not feel he had a right to just turn around and leave. We believe the facts show that the security officer did demand back the pouch and that he was going to search it. The testimony by the divorce lawyer who was present with Mr. Prieto had indicated that Mr. Prieto had told the security officer, no, don't search that item. He had testified that Mr. Prieto said he did not want to go into the courtroom and wanted to leave. And more importantly, at least in the attorney's mind, the divorce lawyer's mind, he said that it appeared that the security officer somewhat changed his tune. He said, if you don't let me search that, you can't go into the courtroom. He changed his tune to, well, irrespective of whether you're going into the courtroom or not, I'm going to search that item. This is all according to the attorney, correct? Yes. And we believe that that evidence is the more credible evidence. But the judge ---- I mean, the trial judge heard all of this, correct, all the testimony from the witnesses, didn't she? And she decided to maybe not give much credence to the testimony of the attorney. I mean, there was a dispute as to what was said. There was a dispute, Your Honor. And but ---- Do we second guess? Do we ---- I mean, do we say, well, the trial judge was wrong in believing a witness over another witness? In other words, did she clearly err in her conclusion? Well, that ---- and correct me if I'm wrong. I don't believe there was an order to that that, you know, said that. And in fact, there is part of the record that indicated that the judge had allowed the attorney to speak over objection with respect to his opinion of the security officer having a change of heart and insisting on searching the item. But this point is made with respect to the consent or the feeling that he had no ability to say no. Okay. I think we understand your argument on that. Do you want to talk about whether it was abusive discretion to admit the evidence of the later arrest or to allow impeachment with respect to the P. colloquy? And the first of those, of course, is a plain error standard because that was not preserved at trial. Isn't that correct? That is, Your Honor. That is correct, Your Honor. We would just ---- we would just ---- You've covered it pretty well in the briefs. You may just want to rest on the brief or if you want to add anything, you certainly may. We would just submit on the brief, but I just would like to say that there is no close parallel with respect to those items that were submitted. And it did prejudice defendant extremely. Extremely in that credibility was a big issue with respect to his June 9th trial. All right. I just would like to also touch on the sentencing as to the sentencing guidelines with respect to the grouping aspect of how Mr. Prieto was sentenced. He eventually received 188 months for this particular crime. We would submit that the probation officer had improperly grouped this count 2 along with counts 1 and 3 pursuant to 3D1.2B. But one of his convictions was for a conspiracy. That is correct. But when you look at the record, Your Honor, the conspiracy, the government had included a portion of the period of time to include the period in which the June 9, 2003 incident occurred. However, when you look at the actual time period of the pertinent investigation on this case, Mr. Prieto doesn't show up until months later in some recorded telephone conversations. The second charges, counts 2 and 3 on the superseding indictment, all occurred in October of 2004, some four months after this initial alleged, excuse me, this initial incident at the courthouse. The investigations of the government, there's its void. Any investigation with respect to Mr. Prieto is absent and does not start until many months after the June 3, 2003 incident. The subsequent investigation was methamphetamine, correct? That was a conspiracy? That's correct. And it occurred after 2003? It occurred four months after the courthouse incident. Now, the courthouse incident was cocaine. The 2000, excuse me, the conspiracy in the case was 2000 and, excuse me, involved methamphetamine. The parties aren't the same. The first one involved a security officer administrative search. The second involved this conspiracy case involving distribution of methamphetamine. Joinder may have been or may have been inappropriate and a motion may have been prudent. However, defendant had pled to counts 1 and 3 of the superseding indictment. So that didn't really come into play. But I guess my main point is 3d1.2b, the probation officer shouldn't have grouped these two cases because they're not closely related counts. They don't involve the same victims, and they are not connected by common scheme or criminal objective, even though the indictment was expanded to include this. So if you separate them and you run an analysis for count 2 on just the 5 grams of cocaine, you would come out with a level 14, base level 14. Actually, base level 12, and then you might increase 2 for obstruction of justice for just the cocaine. Then you would come out with a base level 14. And then you would, and this is what we like to argue, with respect to counts 1 and 3, he should receive the acceptance of responsibility to cooperation credit. There was no obstruction of justice. The government is bootstrapping the fact that he perjured himself or may have perjured himself on the first trial with counting that obstruction of justice to, yes, in count 2, 2b's. Therefore, he did not obtain any of the credit that were adjustments that he should have received under the advisory guidelines. So if you allow him to have all of these adjustments, his base level offense would have been 34 based on the quantity. You would subtract 2 for acceptance of responsibility. You subtract 1 under 3E1.1b, and that would equal level 31, which was 108 months. And it would remind me, what did he get? What level? He stayed at, Your Honor, I believe a level 34. 34. After 188 months. All right. Sure. Plus he cooperated. That doesn't even consider the cooperation credit, the 5K. We believe he would have received 5K. The evidence does reflect that there was a number of discussions inferring that he would receive 5K, but he went to trial on count 2. All right. So overall, Your Honor, Mr. Prieto was, is being punished for requesting a trial on count 2. Okay. And fundamentally that's unfair. Thank you, counsel. You have plenty of time for rebuttal. We'll hear from the government. Good morning, Your Honors. May it please the Court. Candice Kelley on behalf of the United States. I'll begin with the issue that Mr. Park began with, which is the search of the pouch at the family courthouse in Kona, Hawaii. As the Court raised, Mr. Prieto, by saying that he had just found this pouch and did not know the contents of the pouch, did not have standing. He did not have a reasonable expectation of privacy in that pouch and its contents. Nevertheless, even if, even if this Court were to find that he did have standing, the search was reasonable under the circumstances. The district court made factual findings. The district court is in the best position to make determinations of credibility, and the district court heard from the defendant, not in the evidentiary hearing, but he made statements at the plea colloquy when he pled to counts 1 and 3, and the time that she made these rulings. She heard from Mr. Kim, his attorney, and she heard from the security guard at the Wackenhut security guard from the courthouse. And her findings were that Mr. Prieto, even, even if, if you were to take the statements of the attorney who was the only person who indicated that Mr. Prieto had made some indication that he wanted to leave the courthouse rather than enter the courthouse, the district court looked at the overall situation and the facts, which were that at secondary, once the metal detector beeped, the security guard used the wand, found the pouch, and took that pouch from Mr. Prieto and was about to search it. And before that happened, Mr. Prieto grabbed it back from him. At that point, the security guard advised Mr. Prieto that he had a choice, that he could either, he either had to submit to the secondary search or he couldn't go into the courthouse. And the facts are that Mr. Prieto relinquished the pouch. The pouch was searched and he went into the courthouse. He had the choice. He could have turned around and put the pouch in his car and he could have come back into the courthouse. He didn't make that choice. And those overall circumstances led the Court to, to her findings, which were not clearly erroneous, that he was advised, he was not detained, and he made the choice to enter the courthouse. And so that search was reasonable and should be upheld. With respect to the evidence that was admitted at trial, the evidence of the other two counts, basically, the conspiracy and his possession of the 292 grams of methamphetamine, those, those facts were agreed upon, agreed, the defense counsel at trial agreed to let those facts in. And, in fact, during the opening statement, the defense counsel seemed concerned that the AUSA might go beyond what the agreement was, and he objected during opening and clarified that he was fine, he had no problem if the AUSA stuck with the information that he had put in his 404B notice prior to, to trial. And certainly, there may be a number of reasons why trial counsel made that. We wouldn't necessarily know what the trial strategy was, but one can imagine a situation like this where allowing the jury to know that the defendant had admitted to certain amounts of drugs might help to, to try and convince a jury that he's not afraid to admit when he does something wrong, but in this situation, he's saying that he didn't. And so it was not plain error to let that in, particularly given that he had agreed to it, and certainly it is evidence of knowledge and intent with respect to drug trafficking, which was the only issue at trial in this case. The other evidence that came in were prior and consistent statements that Mr. Prieto made during the plea colloquy in which he, he stated his intention to plea to all three counts, and the trial judge went through the normal course of, of accepting that plea and, and covered the factual basis for all three counts. She had the attorney for the government recite the facts that the government would be prepared to prove if, if it were to proceed to trial, and then began to voir dire the defendant on those facts. And at that point, during her questioning, it became apparent both to her and apparently to the defense attorney for the first time that he wasn't prepared to plea to count two, and she gave him the opportunity to, to hold off and find out what the government was going to do with that count two. However, they decided at that point to go forward with the pleas to counts one and three and see what the government would do. Kagan. Did the judge continue to talk, to ask him questions about count two after he said he was not going to plead guilty to count two? No. I, what happened in the, is that the government recited the, the facts that they were prepared to prove. And then she turned and said, do you agree with all of those facts? And he said no. And I think that the, following the transcript, that the court asked the questions to determine whether the disagreement with the government's recitation of the facts was something that would preclude him from being able to plead guilty, or if it was sometimes in those situations, there's a defendant who says, well, yes, I knew that I had 5 grams of cocaine in my pocket, but it was in a red pouch instead of a yellow  pouch, and she asked questions to determine what it was that his, his disagreement with the facts were. Do you want to say anything about the grouping of counts? Yes, Your Honor, I would. I recognize that the pre-sentence report in this case, which the district court relied upon, relied on some subsection B of 2D1.2, which talks about the substantially, you know, continuing course of conduct. But I would point out, as I did in my brief, that 2D1.2 subsection D specifically addresses cases involving drug cases, and specifically lists 2D1.1, which is the guideline section for drug case, you know, to determine the offense level for drug cases. And so the guidelines specifically and, of course, the guidelines also have a conversion table to show if you have multiple counts of conviction involving different sorts of drugs, they get grouped for the purposes of sentencing. Counsel, I have a question. On the first issue, we have a case called Aukai, A-U-K-A-I, which involved a search at the airport. That's now going to be reheard by our court in Bank. Is there a correlation at all between that case and this one? There is a correlation, Your Honor, and I did cite to that in my brief, and I recognize that it has been heard on Bank and is pending decision. But I think that that case is distinguishable from this case, first because in that case there's no question of standing. I think the Court here doesn't even need to go beyond the issue of standing because Mr. Prieto, just very similarly to the defendant in the United States v. Veech, denied that this was his property and therefore did not have standing or a reasonable expectation of privacy. Beyond that, in this case, the district court specifically found that the Mr. Prieto consented to the search, that he was given the choice of leaving the courthouse. He was advised, you know, if you're going to go in the courthouse, I have to search this. He was given that choice, and he – the actions that he took reveal that he made a decision to go into the hearing, that he cared more about making sure he was at that hearing than protecting any privacy interests that he may have had. And I think the facts in ALCAI are distinguishable. Roberts. Thank you, counsel. Any further? Unless the Court has any further questions. No, no, counsel. Thank you. Mr. Park, do you want to add anything at all? Sure. We believe the facts bear out that Mr. Prieto would leave, but the pouch was already opened, and the security officer – he would have not entered the courtroom. So we believe that these are unlike the airport cases where they continue on to the plane. He would have not gone into the courthouse if he was given back the pouch and allowed to leave. We believe the facts are not like that. He was – demanded the pouch back, it was opened, and then he just went to the courthouse. He would have left, though, if that didn't occur. And we believe that if the Court – there was no threat, the threat was no longer there because Mr. Prieto would take the pouch and leave. There would be no threat of explosives or weapons entering the courtroom. Isn't that speculation, that he would have left? I mean, he asked for the pouch back, assuming Mr. Kim is right, but aren't you speculating that he would have left?  No, he said that I would – I don't want to go back in the courtroom, but the pouch was taken and opened immediately, and the security was called. And that's according to Mr. Kim, the attorney? That's according to – let me see. I have that. When I finished wanting him – this is the security officer. When I finished wanting him, and then when I went to look into the bag, he had grabbed the bag. He grabbed the bag. Did the – the defendant did, question. Yes, he did. And what happened? He said, no. And I said, I have to search the bag, and then he gave it back to me. And what did you do? I searched the bag. I don't have that exact section, but yes, it would have been. I think it's in the record. Yeah, it's in the record.  Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Hear ye, hear ye. All parties to the statute of limitations of the Honorable United States Court of Appeals of the United States of America will now depart in the support of the State of the United States of America.
judges: Hall, O'scannlain, Gonzalez